JASON WAX (WSBA #41944)
RICHARD B. KEETON (WSBA #51537)
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA 98101
Tel: (206) 292-2110
Emails: jwax@bskd.com, rkeeton@bskd.com

HONORABLE FREDERICK P. CORBIT

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Chapter 11 |
| KATE QUINN ORGANICS, INC., | Case No. 25-00445-11 |
| Debtor. | DECLARATION OF KATHERINE QUINN IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS |

I, Katherine Quinn, declare as follows:

**Introduction**

1. I am the founder, CEO, and sole shareholder of Kate Quinn Organics, Inc. ("KQO" or the "Debtor"). I have personal knowledge of the facts set forth in this declaration and I am competent to testify to the same. I make this declaration in support of the Debtor's first day motions in this case (the "Emergency Motions"), including:

A. Debtor's Emergency Motion for Order (I) Authorizing Continued Use of Prepetition Cash Management System, Bank Accounts, and Check; and (II) Authorizing Debtor to Maintain and Administer Customer Programs and to Honor Prepetition Obligations Related Thereto (the "Cash Management Motion");

B. Debtor's Emergency Motion for Order Approving Adequate Assurance to Utilities (the "Utilities Motion");

DECLARATION OF QUINN IN SUPPORT OF
FIRST DAY MOTIONS – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

C. Debtor's Emergency Motion for Authority to Pay Prepetition Payroll, Employee Benefits, and Related Expenses (the "Wages and Benefits Motion"); and

D. Debtor's Emergency Motion for Entry of Order (I) Authorizing Interim Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Setting Final Hearing (the "Cash Collateral Motion").

Capitalized terms not otherwise defined in this declaration have the same meaning as in the Emergency Motions.

2.     The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on March 14, 2025.

**Background**

3.     KQO is a direct-to-consumer ("DTC") e-commerce retailer of clothing for babies and kids, with matching clothes for moms. KQO designs and manufactures its clothing in India with collectible custom prints and styles, using some sustainable and organic fabrics. It has a strong online following on social media channels and does fresh product launches weekly.

4.     I started KQO because I wanted to create a brand that spoke to moms who were interested in organic fibers and sustainability while incorporating bright colors, fun prints and many of the design components of conventional brands that at the time were not represented in organic or eco-centric brands. A friend of mine was working with a surf hotel in Nicaragua and shared some info about organic cotton farming. Eventually, I found a supplier in India and I thought their organic cotton farming and production was a good fit, so I designed and had our first pieces produced.

DECLARATION OF QUINN IN SUPPORT OF
FIRST DAY MOTIONS – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

25-00445-FPC11    Doc 6    Filed 03/14/25    Entered 03/14/25 16:16:08    Pg 2 of 22

5. Over the years, KQO has sold to Target, Nordstrom, and Crate & Barrel, as was as through international franchise stores.

6. KQO spent many years as an omni-channel brand, selling product through wholesale, retail, international distribution, and franchise channels. In 2018, I realized my true love was our end consumer—I am obsessed with delighting them, creating pieces that speak to the magic of childhood and the memories made, so we decided to transition to a direct-to-consumer ("DTC") model that is based on connection with our customers.

7. My minority business partner at the time, with whom I had not had a good working relationship, decided to return to the business in 2019 when he saw the tax returns evidencing solid financial performance. Despite our previously poor business relationship, I decided to let him jump back in, partly because he told me he had made some personal changes, and partly because he was offering to come on as COO and CFO at a time when I was feeling very much like I needed more operational help. He had a strong background in children's retail, digital marketing, and small business financial and operational support.

8. KQO continued to do well, and by the time pandemic hit in early 2020, we had already experienced some awesome growth, and we were running super lean and were profitable, all while scaling safely with small capital loans. As the business continued to grow and landed on the INC 500 several times in a row, we began to gain more attention from PE firms, bankers and the media. I recall being told that KQO was likely worth something in the range of $100 million due to our recent growth trajectory, so I agreed that it made sense to go to market.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

9. We signed a contract with investment bank Cascadia Capital in 2021 to find a deal for us. My business partner owned all the relationships at this point including the CPA that he hired, our operational staff, suppliers and vendors. As the creative side of the business, I was essentially kept in a "don't tell Kate, just have her create" box for several years.

10. In 2021, we delayed going to market to get Q4 on the books. We went to market in Spring 2022 and despite my pleas, my business partner launched a new warehouse management system ("WMS") system that month. From the beginning, the WMS was a disaster. It was non-functional, we could hardly get orders out for 30 days, we couldn't bring new product in—all during a period when the New York Times had done a story on us and we couldn't ship any of the new orders from the heavy traffic. This crushed us operationally and made our customers hate us. Someone threated to burn my house down, another lady showed up at my home, and my children were doxxed online by an angry customer who shared both the name of their elementary school and our home address with other angry customers in a post on Facebook. It was like a horror show.

11. Meanwhile, the private equity firms who had originally bid $38-72 million were watching all of this. We were able to salvage two options for selling as we limped into Q2 with delayed shipments. We held discounted sales to move out-of-season goods so we could generate cash to pay our suppliers. During this period, my business partner took more and more loans to cover the losses that summer instead of scaling back unnecessary spend. Meanwhile, one particular that had loaned us money had a data glitch and was nearly doubling our payback amounts and taking 60% of our revenue,

DECLARATION OF QUINN IN SUPPORT OF
FIRST DAY MOTIONS – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

1 while another lender was taking nearly all the rest, leaving us with almost nothing to

2 pay for operations.

3        12.    We finally signed an LOI with a PE firm that I really liked. It was much

4 less than the $70 million we had previously been offered, but at that point I just wanted

5 security and was happy to still have an interested buyer. Unfortunately, that deal fell

6 through at the end of 2022 as e-commerce retail generally softened and the PE firm told

7 us that they needed to use their cash to bail out a pet treat deal and wouldn't be able

8 complete their acquisition of KQO. We were left with a wild amount of short term debt,

9 an operational mess, and unsustainable expenses.

10        13.    During this time I learned that my business partner had hired an out of

11 work cellist, not a CPA, to handle KQO's finances, and she had been making large

12 unneeded payments to the IRS that equaled nearly $2.5 million. That severely

13 diminished our working capital during a critical time. This same quasi-accountant also

14 miscalculated our COGS which created an ongoing problem because our margins were

15 less than we thought and that enabled my business partner to keep spending at an

16 unsustainable level.

17        14.    KQO ended 2022 with an $8 million loss, caused by too-large payroll;

18 mismanaged buys (including $6 million in inventory that was lost on the warehouse

19 floor for nearly 6 months); and angry suppliers because of exfactory delays resulting in

20 out of season goods needing to be sold at loss discounts, among other issues. When the

21 dust settled, we were left with about $11 million dollars in short term debt.

22        15.    By working systematically and diligently to reduce cost of goods sold,

23 labor costs, and by implementing fair price increases on key products, among other

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

measures, KQO managed to eke out a profit in 2023, but given the company's crushing debt load from its failed acquisition in 2022, we were forced to operate using expensive short term debt. My business partner departed KQO in December 2022.

16.     In November 2024, creditor Kickfurther stopped lending to us because our bank accounts were apparently too low after we prepaid for a couple of shipments out of India for the holidays. We had no choice but to do that because Kickfurther was slow to fund us. Having the Kickfurther funding dry up severely impacted KQO's ability to get new inventory and generate revenue, causing KQO to fall farther behind with more creditors and creating a cycle of distress that has been impossible to escape.

17.     Moving forward, my team and I have made significant changes to KQO's cost structure including reducing head count to only operationally critical employees (a process that is ongoing); limiting marketing spend and eliminating agency fees; increasing MSRP to more accurately reflect the value of our product; negotiating lower factory costs (ongoing); employing a new buying strategy focused on bringing in only quick moving product to limit mark downs; updating our ship to customer platform, reducing costs by 10%; reducing sample and studio costs; and reducing supply, building and operational costs by shedding our Woodinville lease and working to optimize and shrink the lease for our operations in Lynnwood.

**Use of Cash Collateral**

18.     The Debtor seeks to use Cash Collateral, as that term is defined in the Cash Collateral Motion. A true and correct copy of the Interim Budget is attached as Exhibit A.

DECLARATION OF QUINN IN SUPPORT OF
FIRST DAY MOTIONS – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

19.     The Debtor requires the immediate use of the Cash Collateral to continue uninterrupted operations for the benefit of its creditors and its estate, thereby avoiding immediate and irreparable harm to their business.

20.     The Debtor is unable to obtain sufficient unsecured credit to fund its continued operations without the use of Cash Collateral.

21.     Without use of Cash Collateral, the Debtor will be unable to pay its ongoing operating expenses, including payroll, and will thus be unable to continue ongoing business operations.

22.     The Debtor represents that it has insufficient funds to operate unless it uses Cash Collateral, as it holds no unencumbered funds and does not have sources of unencumbered funds, and that the present circumstances require the Debtor to use Cash Collateral in order to maintain its ongoing business for the benefit of its estate and creditors.

23.     The Debtor has an immediate need to use Cash Collateral to maintain, preserve and protect its assets and has provided for adequate protection of the SBA's interest in the Cash Collateral, as described above.

24.     The Cash Collateral Motion must be heard on an emergency basis to avoid irreparable harm to the Debtor and its estate. Without immediate use of cash collateral, the Debtor will not have the funds necessary to pay payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and property.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

25.     In 2020, the Debtor borrowed approximately $500,000 from the SBA. On July 3, 2020, the SBA filed a UCC financing statement asserting an interest in substantially all the Debtor's assets, including cash collateral. A true and correct copy of that financing statement is attached as <u>Exhibit B</u>. As of the Petition Date, the Debtor owes the SBA approximately $140,000.

26.     The Debtor believes that the following entities may also assert an interest in the Debtor's cash:

| Creditor | Transaction Date | Approx. Balance |
|---|---|---|
| LG Funding LLC | May 2, 2024 | $91,000.00 |
| Ouiby Inc. d/b/a Kickfurther | June 24, 2024 | $100,513.99 |
| CFT Clear Finance Technology Corp. | June 28, 2022 | $3,000,000.00 |
| CFG Merchant Solutions, LLC | July 10, 2024 | $500,000.00 |
| Oat Financial, Inc. | September 4-16, 2024 | $310,000.00 |
| Capybara Capital LLC | October 21, 2024 | $310,000.00 |
| Essentia Funding | November 19, 2024 | $190,000.00 |
| Fox Funding Group LLC | December 12, 2024 | $190,000.00 |
| Pinnacle Business Funding LLC | December 20, 2024 | $140,000.00 |

**Utilities**

27.     The Utility Providers listed on <u>Exhibit A</u> to the Utilities Motion provided utility services to the Debtor prior to the Petition Date. The continuation of those utility services is crucial to the Debtor's continued operations and reorganization, and the Debtor may suffer irreparable harm if the relief requested in the Utilities Motion is not

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

granted. The Debtor intends to timely pay all post-petition amounts owed to its Utility Providers.

28.     As adequate assurance of future payment to the Utility Providers, the Debtor proposes to establish and fund an account in the amount of $3,545.00. This amount is equal to approximately two (2) weeks of utility service from all the Debtor's Utility Providers based upon the Debtor's current and historical utility usage and bills as reflected on <u>Exhibit A</u> to the Utilities Motion. The Utility Account established by the Debtor will serve as a cash security deposit to provide adequate assurance of payment for utility services the Utility Providers provide to the Debtor after the Petition Date.

29.     If the Debtor fails to timely pay a Utility Provider for post-petition utility services, the Utility Provider may submit a payment request to the Debtor, certifying that the Debtor failed to pay for post-petition utility services and that such amounts remain outstanding. The Debtor shall then be required to pay the outstanding amount within seven (7) business days following receipt of the payment request from the Utility Provider, subject to the Debtor's right to contest the payment request in this court or any other court with jurisdiction.

30.     Payments from the Utility Account shall be made in the order that the Debtor receives requests and the Debtor shall ensure that the Utility Account is replenished such that its balance remains at or above $3,545.00, or such greater amount as the court may require.

31.     The Utilities Motion must be heard on an emergency basis because it is imperative to the Debtor's operations that it continues to receive utility services,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

unaltered and uninterrupted, in light of the Debtor's provision of adequate assurance to utility providers.

**Cash Management**

32.     As of the Petition Date, the Debtor maintains two bank accounts and five merchant accounts with various fintech online payment platforms as described in the following table:

| Bank / Merchant Name | Account No. (last four) | Type of Account | Purpose of Account |
|---|---|---|---|
| Bank of America | 5708 | Business Checking | Operating (inactive) |
| Bank of America | 4106 | Business Checking | Operating |
| Afterpay | N/A | Payment Gateway | Online payment platform |
| PayPal | N/A | Payment Gateway | Online payment platform |
| Shopify | N/A | Payment Gateway | Online payment platform |
| Shop Pay | N/A | Payment Gateway | Online payment platform |
| Square | N/A | Payment Gateway | Outlet Store payment platform |

33.     As of the Petition Date, the flow of funds between and among the Debtor's various financial accounts is as follows: In-store sales are processed through KQO's Square account, with revenue from those sales transferred to KQO's Bank of America 4106 operating account (the "Operating Account"). Website online sales are processed through Shopify, and revenue from those sales is transferred to the Operating Account. KQO also receives some payments from customers via various payment gateways listed above, which are deposited into the Operating Account. All business expenses are paid out of the Operating Account either directly or indirectly. KQO depends on the continuity of its bank accounts and linked online payment platforms to effectuate significant daily transactions as part of its regular course of business. KQO's bank accounts do not

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

1  generally contain funds that exceed a total balance of $250,000 and I do not anticipate

2  its funds in those accounts will exceed $250,000 at any time during this Chapter 11 Case.

3      34.    KQO's cash management system in an integral part of our business

4  operations and requiring us to establish a new cash management system would cause

5  unnecessary delay and disruption, making it more difficult for us to successfully

6  reorganize. For similar reasons, requiring KQO to open new bank accounts and to obtain

7  new checks would also be unnecessarily disruptive while providing no benefit to the

8  estate or its creditors. Continued use of our cash management system, bank accounts, and

9  checks will help to ensure a smooth transition in chapter 11 and minimal disruption to

10  our operations.

11      a. KQO's Cash Management System allows us to centrally manage cash and

12  includes the necessary accounting controls to enable KQO to trace funds through the

13  system and ensure that all transactions are adequately documented and readily

14  ascertainable.  While the Chapter 11 Case is pending, KQO will continue to maintain

15  detailed records reflecting all transfers of funds.

16  **Customer Programs**

17      35.    KQO employs the following customer programs which are standard in the

18  retail clothing industry. Without the ability to continue the Customer Programs and

19  satisfy any prepetition obligations owed in connection with those Programs, KQO risks

20  losing customer loyalty, goodwill, and market share in a competitive environment, which

21  loss could cause a precipitous decline in the value of the Debtor's business. KQO's ability

22  to continue the Customer Programs is necessary to keep our reputation intact, meet

23  competitive market pressures, ensure customer satisfaction, and, ultimately, maximize

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

value for the Debtor's estate and stakeholders.

36.    KQO's Customer Programs include but are not limited to: (1) a gift card program; (2) loyalty program points and coupons; (3) Debtor-issued store credit; and (4) a refund policy. A summary of each Customer Program is set forth below:

| Customer Program | Approx. Prepetition Obligations |
|---|---|
| Gift Card Program | $402,377.76 |
| Loyalty Program | $906,000.00 |
| Store Credit | $105,570,70 |
| Refund Policy | $0 |

Gift Card Program

37.    KQO maintains a gift card program whereby customers can purchase gift cards online in customizable denominations up to $1,000, which the customer funds in advance and which are accepted as payment for purchases in the ordinary course of the Debtor's business. As part of its gift card program, KQO also conducts limited promotional contests and giveaways pursuant to which gift cards are given away as prizes. Gifts cards are also issued by the Debtor for various reasons such as giveaways, price adjustments, shipping issues, and inconvenience "we are sorry" $5 gift cards.

38.    KQO honors gift cards without expiration as part of its regular business operations. In the twelve-month period preceding the Petition Date, KQO issued approximately $44,030.00 worth of gift cards through customer purchases. As of the Petition Date, KQO estimates that the aggregate amount outstanding for issued gift cards is approximately $400,000. Given the various methods through which KQO gift cards are distributed and sold, the Debtor is unable to track the aggregate gift card hold size on a per-customer basis. However, based on general customer usage, I believe that any

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

customer claims arising under the gift card program are likely entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code, up to $3,350 per individual.

Loyalty Program

39.     KQO also administers a customer loyalty program, in which customers can earn loyalty points for each purchase based on their spending with KQO. As part of the loyalty program, every dollar spent earns the customer 1 Point, which may be redeemed for coupons in the following denominations:

- 300 Points:   $25 Off Coupon
- 500 Points:   $50 Off Coupon
- 750 Points:   $80 Off Coupon
- 1000 Points: $120 Off Coupon

As of the Petition Date, there are approximately 60,000 members in the KQO loyalty program, of which approximately 41,355 currently hold loyalty program points.

40.     The KQO loyalty program is a strategic way of incentivizing customer loyalty and repeat visits by providing added value to customers. KQO utilizes the loyalty program in two manners: (i) as a rewards-based loyalty program designed to drive marginal sales through data-driven offers, and (ii) as a brand-owned channel for efficiently communicating with customers to increase engagement. As of the Petition Date, the Debtor estimates that total liabilities for loyalty program are approximately $900,000.

41.     KQO's continued participation in the loyalty program is both (a) fundamentally important to the continued success of KQO customer direct sales, and (b)

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

1    a critical means of maintaining customer loyalty from existing customers and attracting
2    new customers.

3    Store Credit and Refund Policy

4    42.    In the ordinary course of its business, KQO issues store credit to customers
5    for various reasons, including but not limited to damaged/wrong items delivered, missing
6    item/package, out of stock, recall credit, and store credit for returns or exchanges. KQO
7    also maintains an online refund practice for purchases that is consistent with what I
8    understand to be retail industry practice: refunds may be requested within 30 days of the
9    underlying transaction, and are satisfied either by issuance of store credit or credit card
10   refund. The refund policy assures that guest issues will be resolved if the merchandise
11   provided does not meet customer expectations.

12   43.    The Cash Management Motion must be heard on an emergency basis to
13   avoid the irreparable harm of disruption to and termination of the Debtor's operations.
14   As detailed in the Cash Management Motion, the Debtor's uninterrupted ability to honor
15   prepetition gift cards and to continue to use existing cash management systems and pre-
16   petition bank accounts and checks, and to honor prepetition gift cards in the ordinary
17   course of business is critical to the Debtor's continued operations post-petition.

18   **Wages and Benefits**

19   44.    The Debtor currently has 25 full-time employees, 7 part-time employees,
20   and 22 on-call staff.

21   45.    The Debtor has incurred costs and obligations with respect to the Employees
22   that remain unpaid as of the Petition Date because they accrued, either in whole or in
23   part, prior to the Petition Date.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

25-00445-FPC11    Doc 6    Filed 03/14/25    Entered 03/14/25 16:16:08    Pg 14 of 22

46.     KQO pays wages and salaries to its Employees every two weeks. We process payroll through payroll processing company ADP. Funds clear KQO's account every other Tuesday or Wednesday, and employees and contractors are paid on Friday (i.e., two days later). Payroll is always paid 1 week after the hours worked. Our average aggregate gross payroll for all Employees is approximately $80,000-$110,000 every two weeks. The next payroll date is March 21, 2025 for the pay period of March 1, 2025 through March 14, 2025, with gross payroll in the approximate amount of $107,100.

47.     It is critical to the continuation of KQO's operations, and to our smooth transition into chapter 11, that payments to our Employees are made in a timely manner. In light of the foregoing, KQO seeks authority to pay its Payroll Obligations for work performed prior to the Petition Date for the pay period ending March 14, 2025, due March 21, 2025, as well as the pre-petition portion of the pay period running from March 1, 2025 through March 14, 2025, in accordance with its ordinary prepetition practices. No Employee is owed more than $13,650 for prepetition wages.

48.     KQO maintains various employee benefits programs (the "<u>Benefits Programs</u>") and pays various administrative fees[1] and premiums in connection those programs, including health insurance premiums for active full time Employees (medical,[2] dental[3] and vision[4]), a 401(k)[5] plan and paid leave.  I believe that KQO's failure to honor

---

[1] Health insurance brokerage fees due and payable to The Baldwin Group are directly paid through the Debtor's Benefits Program's vendors.

[2] Regence BlueShield, Group No. 10046101, Regence Classic plan.

[3] Delta Dental, Group No. 15975, Delta Dental PPO.

[4] VSP Vision Care, Inc., VSP Choice Plan, Policy No. 40153835.

[5] Automatic Data Processing, Inc. (ADP), 401(k) retirement plan, Plan No. 284436.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

its obligations in connection with the Benefits Programs could result in attrition at a time when the Debtor is most susceptible to business disruption on account of labor fluctuations. Therefore, it is essential that KQO maintain and promote loyalty and morale among its Employees at this critical time.

49. I estimate that, as of the Petition Date, KQO pays approximately $5,925 per month total on account of the Benefits Programs.

50. The Debtor is required by law to withhold from the Employees' wages amounts related to federal income taxes, and Social Security and Medicare taxes (collectively, the "<u>Trust Fund Taxes</u>") and to remit the same to the appropriate taxing authorities (the "<u>Taxing Authorities</u>"). The Debtor is required to match from its own funds the Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts of unemployment insurance (together with the Trust Fund Taxes, "<u>Payroll Taxes</u>") and to remit the Payroll Taxes to the Taxing Authorities.

51. I estimate that, on a semi-monthly basis, KQO remits a total of approximately $26,730, including both Payroll Taxes and Tax Withholdings to the Taxing Authorities.

52. It is critical that the Wages and Benefits Motion be heard on an emergency basis because the Debtor's ability to continue to honor its prepetition employee obligations is vital to the post-petition stability of the Debtor's workforce. The support and efforts of the Debtor's workforce are critical to the Debtor's successful reorganization. Any delay in payments to employees or disruption of their benefits may irreparably harm employee morale, dedication, and cooperation, and poses a legitimate risk of losing the Debtor's personnel.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

25-00445-FPC11    Doc 6    Filed 03/14/25    Entered 03/14/25 16:16:08    Pg 16 of 22

53.     For many of the Debtor's Employees, the payments received from the Debtor are needed to enable the Employees to meet their own financial obligations. As a result, absent an order granting the relief requested, the Employees and their families are likely to suffer personal hardship and, in many instances, serious financial difficulties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 14th day of March, 2025 at Lynnwood, Washington.

_Signed by:_

Katherine Quinn

DECLARATION OF QUINN IN SUPPORT OF
FIRST DAY MOTIONS – Page 17

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104`

2870 ic07kh01dh

25-00445-FPC11     Doc 6     Filed 03/14/25     Entered 03/14/25 16:16:08     Pg 17 of 22

# EXHIBIT A

**Kate Quinn Organics**
**Cash Collateral Budget**
**3/14/2025**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended Sunday | Forecast 3/23/2025 | Forecast 3/30/2025 | Forecast 4/6/2025 | Forecast 4/13/2025 | Forecast 4/20/2025 | Forecast 4/27/2025 | Forecast 5/4/2025 | Forecast 5/11/2025 | Forecast 5/18/2025 | Forecast 5/25/2025 | Forecast 6/1/2025 | Forecast 6/8/2025 | Forecast 6/15/2025 |
| **Beginning Cash Balance** | 2,000 | 111,400 | 62,500 | 134,100 | 87,500 | 11,400 | 20,500 | 28,600 | 21,900 | 66,900 | 110,000 | 25,500 | 37,500 |
| **Inflows** | | | | | | | | | | | | | |
| Deposits | - | 300,000 | 402,400 | 219,300 | 249,600 | 253,800 | 287,500 | 301,000 | 310,200 | 322,200 | 282,100 | 313,800 | 302,200 |
| Owner Contribution | 250,000 | | | | | | | | | | | | |
| **Total Inflows** | 250,000 | 300,000 | 402,400 | 219,300 | 249,600 | 253,800 | 287,500 | 301,000 | 310,200 | 322,200 | 282,100 | 313,800 | 302,200 |
| **Outflows** | | | | | | | | | | | | | |
| Inventory | - | 259,700 | 56,700 | 125,600 | 150,200 | 112,700 | 27,300 | 157,600 | 64,200 | 134,100 | 115,500 | 116,500 | 120,400 |
| Freight | - | 61,600 | 69,200 | 37,700 | 35,900 | 43,600 | 49,400 | 51,800 | 60,300 | 55,400 | 48,500 | 54,000 | 52,000 |
| Returns | - | 2,700 | 3,700 | 2,000 | 2,500 | 2,300 | 2,600 | 2,800 | 2,800 | 2,900 | 2,600 | 2,900 | 2,800 |
| Factory Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payment Processors | - | 3,000 | 4,000 | 2,200 | 2,500 | 2,600 | 2,900 | 3,000 | 3,100 | 3,200 | 2,800 | 3,200 | 3,000 |
| Payroll | 107,100 | 5,300 | 103,100 | 18,000 | 107,100 | 5,300 | 103,100 | 18,000 | 107,100 | 5,300 | 103,100 | 18,000 | 107,100 |
| Employee Benefits | 1,300 | - | 30,200 | - | 300 | - | 30,200 | - | 300 | - | 30,200 | - | 300 |
| Loan Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fund | - | - | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - |
| US Trustee Fees | - | - | - | 2,100 | - | - | - | - | - | - | - | - | - |
| Facilities | 1,500 | 5,100 | 38,000 | 1,500 | 1,500 | 1,500 | 38,000 | 1,500 | 1,500 | 1,500 | 38,000 | 1,500 | 1,500 |
| Advertising & Marketing | 20,000 | - | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 | 15,200 |
| Insurance | - | 800 | - | 7,200 | - | 800 | - | 7,200 | - | 800 | - | 7,200 | - |
| Office Expense | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Software & Equipment | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| Tax & Licenses | - | - | - | 43,700 | - | - | - | 39,900 | - | - | - | 72,600 | - |
| Misc | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 | 7,700 |
| **Total Outflows** | 140,600 | 348,900 | 330,800 | 265,900 | 325,700 | 244,700 | 279,400 | 307,700 | 265,200 | 279,100 | 366,600 | 301,800 | 313,000 |
| **Net Activity** | 109,400 | (48,900) | 71,600 | (46,600) | (76,100) | 9,100 | 8,100 | (6,700) | 45,000 | 43,100 | (84,500) | 12,000 | (10,800) |
| **Ending Cash Balance** | 111,400 | 62,500 | 134,100 | 87,500 | 11,400 | 20,500 | 28,600 | 21,900 | 66,900 | 110,000 | 25,500 | 37,500 | 26,700 |

# EXHIBIT B

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Date of Filing : 07/03/2020
Time of Filing : 02:06:00 PM
File Number : 2020-185-6552-0
Lapse Date : 07/03/2025

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
WAFilings@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Corporation Service Company
801 Adlai Stevenson Dr
Springfield, IL 62703
USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Kate Quinn Organics, Inc. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 16531 13th Ave W, Suite A102 | Lynnwood | WA / 98037 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| U.S. Small Business Administration | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 10737 Gateway West, #300 | El Paso | TX / 79935 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
[190740904]

4. This FINANCING STATEMENT covers the following collateral:

includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

 331897 8003